# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF WEST VIRGINIA

## AT BECKLEY

|  |  |
|---|---|
| FIREFIGHTERS' RETIREMENT SYSTEM OF LOUISIANA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MASSEY ENERGY COMPANY, DON L. BLANKENSHIP; BAXTER F. PHILLIPS, JR.; ERIC B. TOLBERT, DAN R. MOORE; E. GORDON GEE; RICHARD M. GABRYS; JAMES B. CRAWFORD; ROBERT H. FOGLESONG; STANLEY C. SUBOLESKI; LADY BARBARA THOMAS JUDGE; and J. CHRISTOPHER ADKINS; <br><br> Defendants, | No.  5:10-0776 <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>CLASS ACTION</u> |

Plaintiff Firefighters' Retirement System of Louisiana ("Plaintiff") has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Massey Energy Company ("Massey" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities fraud class action on behalf of purchasers of the publicly-traded securities of Massey (the "Class") between February 1, 2008 and May 16, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Massey and certain of its officers and directors.

2.     On April 5, 2010, an explosion rocked Massey's Upper Big Branch mine ("UBB"), killing 29 workers in one of the worst-ever mining incidents in the U.S. ("the "Explosion").  UBB is located in Montcoal in Raleigh County, West Virginia, and is owned by a Massey subsidiary called Performance Coal Company ("Performance Coal").  The Explosion was so powerful that it bent and twisted the steel rail tracks in UBB.  Safety experts opine that the Explosion was caused by: (a) high levels of flammable coal dust; and (b) concentrated levels of methane in the air.

3.     As discussed in detail below, Massey's top executives and Board of Directors (the "Board") were well aware of the fatal conditions at UBB, but deliberately and recklessly disregarded them in the name of the Company's "profits-at-all-costs" corporate philosophy. Indeed, over the past three years, UBB's operations were cited by federal safety inspectors

hundreds of times for dangerous violations of regulations—including the volatile buildup of explosive methane and coal dust, the reported causes of the Explosion.  The U.S. Mine Safety and Health Administration ("MSHA") cited UBB for a total of ***515 safety violations in 2009 alone***.

4.       Moreover, Massey's Board was expressly informed of the Company's deliberate disregard for safety regulations prior to the Class Period, and at least as early as June 13, 2007.  That day, two Board members—Daniel S. Loeb ("Loeb") and Todd Q. Swanson ("Swanson")— sent a joint letter of resignation to the Board (the "Resignation Letter").  The Resignation Letter was prompted by "***the Company's confrontational handling of environmental and [safety] regulatory matters***."  In the Resignation Letter, Loeb and Swanson noted:  "**[C]orrectible deficiencies combine to maintain *a 'Blankenship Discount' in the market price for Massey's shares, and do a grave disservice to shareholders*** . . . .  We cannot stand by while the Board fails to address these [safety] concerns."[1]

5.       Notwithstanding the Resignation Letter and the hundreds of safety violations at UBB corroborating it, during the Class Period, the Company claimed to be one of the safest mine operators in the industry.  Massey regularly touted its safety achievements and told investors that "***Safety is job one***."  Contrary to this representation and others like it, Massey is one of the worst offenders of safety regulations in the mining industry.

6.       After the Explosion, when the market came to understand the circumstances that caused it, the price of Massey securities fell $9.47, ***more than 17 percent***, over the next two days.  The marketplace also learned after the Explosion that UBB is not the only Massey mine with a litany of safety violations, citations, and fines.  In fact, three other Massey mines are

---

[1] All emphases are added unless otherwise noted herein.

among the top 20 worst mines in the nation based on the number of "significant and substantial"

violations (violations likely to result in reasonably serious injury or illness).  In addition, in 2009,

ten of Massey's coal mines had injury rates that exceeded the national average.  Miners in four of

those mines, including UBB, were injured at rates more than double the national average.  The

ten mines together received 2,400 federal safety violation citations in 2009.

7.     Unfortunately, Massey avoided closure of its distressed mines, including UBB, by

pursuing a strategy of incessantly appealing citations and fines, without a reasonable basis to do

so.  This strategy has proved successful for Massey because federal regulations provide that mine

closure cannot begin unless a mine has a current, *uncontested* "withdrawal order" in place.  Even

though UBB was issued 16 withdrawal orders, Massey disputed each and every one of them,

stalling closure.  Massey has actually contested more federal safety violations and fines than any

other coal mining company in the U.S.  Testifying before a Senate panel on April 27, 2010, Joe

Main, the head of MSHA, said:  "***The 'catch-me-if-you-can' model of workplace safety and***

***health appears to have been at work at UBB***."

8.     On April 30, 2010, it was disclosed that the Federal Bureau of Investigation

("FBI") was investigating Massey for bribery of state and federal mine inspectors.  At least two

dozen Massey employees, federal and state officials, and mine union members have been

interviewed by FBI agents.  As a result of this news, Massey stock fell $4.53 per share, or ***11***

***percent***, to $36.63 on April 30, 2010.

9.     On May 14, 2010, federal prosecutors from the U.S. Attorney's Office for the

Southern District of West Virginia confirmed that Justice Department officials are investigating

possible "willful criminal activity" by Massey subsidiary Performance Coal and its "directors,

officers, and agents" for alleged violations of federal mine safety regulations at UBB between

2007 and 2010.  As a result of this news, Massey stock fell from $37.00 on May 14, 2010 to a

new low of $33.29, or **10 percent**, on May 17, 2010.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by

the SEC [17 C.F.R. § 240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act, 28 U.S.C. § 1331 [15 U.S.C. § 78aa].

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28

U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in

substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications, and the facilities of the national securities

markets.

## PARTIES

14.     Plaintiff Firefighters' Retirement System of Louisiana purchased the publicly-

traded securities of Massey at artificially inflated prices during the Class Period, as set forth in

the accompanying Certification and incorporated by reference herein, and has been damaged

thereby.

15.     Defendant Massey is a Delaware corporation that maintains its corporate

headquarters in Richmond, Virginia and its operational headquarters in Julian, West Virginia.

Massey is one of the largest coal producers in the United States and the largest coal company in

Central Appalachia, its primary region of operation, in terms of tons produced and total coal reserves. The Company operates 56 mines—including 42 underground mines and 14 surface mines—in West Virginia, Kentucky, and Virginia.

16.     Defendant Don L. Blankenship ("Blankenship") has served as the Company's Chief Executive Officer ("CEO") since November 2000 and as its President from November 2000 until November 2008. He has been a director of the Company since 1996 and Chairman of the Board of Directors (the "Board") since November 30, 2000. He has been Chairman and CEO of A.T. Massey Coal Company, Inc. ("A.T. Massey"), the wholly-owned and sole, direct operating subsidiary of Massey, since 1992, and served as its President from 1992 until November 2008. Blankenship is presently Chair of Massey's Executive Committee. Blankenship participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the inaccurate press releases and SEC filings.

17.     Defendant Baxter F. Phillips, Jr. ("Phillips") was elected President of the Company effective November 10, 2008, and has been a Massey director since May 22, 2007. He previously served as Executive Vice President and Chief Administrative Officer of the Company from November 20, 2004 to November 2008. He served as Senior Vice President and Chief Financial Officer ("CFO") of the Company from September 1, 2003 to November 2004, and as Vice President and Treasurer from 2000 to August 2003. Phillips joined Massey in 1981 and has also served in the roles of Corporate Treasurer, Manager of Export Sales, and Corporate Human Resources Manager, among others. Phillips is also a member of the Company's Safety, Environmental, and Public Policy Committee ("SEPPC") and Finance Committee. Among other responsibilities, the SEPPC is charged with: reviewing the Company's safety performance, policies, and practices; providing quarterly reports on the Company's compliance with worker

safety rules and regulations; and determining the specific content and organization of mine safety reports presented to the Board so as to reasonably inform the Board regarding the Company's compliance with all applicable mine safety laws and regulations.  Phillips participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the inaccurate press releases and SEC filings.

18.     Defendant Eric B. Tolbert ("Tolbert") is CFO and Vice President of Massey. Tolbert participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the inaccurate press releases and SEC filings.

19.     Defendant Dan R. Moore ("Moore") has been a Massey director since 2002. Moore serves on all of the Board's Committees—the SEPPC, Compensation Committee, Governance and Nominating Committee, Executive Committee, and Finance Committee.  He also serves as Chair of the Audit Committee.

20.     Defendant E. Gordon Gee ("Gee") was a Massey director from 2000 until July 1, 2009.  At all relevant times hereto, Gee served as a member of the SEPPC, Executive Committee, Audit Committee, and Governance and Nominating Committee.

21.     Defendant Richard M. Gabrys ("Gabrys") has been a Massey director since May 22, 2007.  He has also served as a member of the SEPPC and Governance and Nominating Committee since that date.  At present, Gabrys is also a member of the Executive Committee and Chair of the Finance Committee.

22.     Defendant James B. Crawford ("Crawford") has been a Massey director since 2005.  At all times relevant to the claims asserted herein, he has served as a member of the SEPPC as well as serving as Chair of the SEPPC after Gee's retirement in July 2009.  He is also a member of the Executive Committee, Audit Committee, Compensation Committee, and

Governance and Nominating Committee.

23.     Defendant Robert H. Foglesong ("Foglesong") has been a Massey director since February 21, 2006.  He is a member of the SEPPC, Executive Committee, Audit Committee, and Governance and Nominating Committee.  He is also Chair of the Compensation Committee.

24.     Defendant Stanley C. Suboleski ("Suboleski") has been a Massey director since May 2008.  Since August 2006, Suboleski has provided mining engineering consulting services to Massey.  He serves as a member of the SEPPC, Finance Committee, and Governance and Nominating Committee.

25.     Defendant Lady Barbara Thomas Judge ("Judge") served as a director of Massey from February 19, 2008 until her resignation on April 19, 2010.  During that time, she was Chair of the Governance and Nominating Committee and a member of the SEPPC.

26.     Defendant J. Christopher Adkins ("Adkins") has been Massey's Senior Vice-President and Chief Operating Officer since June 23, 2003.  In his current position, Adkins oversees all mining and processing operations and reports directly to Blankenship.  Adkins participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the inaccurate press releases and SEC filings.

27.     The Defendants named in Paragraphs 16 through 26 are referred to as the "Individual Defendants."

28.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Massey, were privy to confidential and proprietary information concerning Massey, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Massey, as discussed in detail below.  Because of their positions with Massey, the

Individual Defendants had access to non-public information about the Company's safety record, business, finances, and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

29.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Massey's business.

30.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Massey's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

31.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock is registered with the SEC, traded on the New York Stock Exchange ("NYSE"), and governed by the federal securities laws, the Individual

Defendants had a duty to promptly disseminate accurate and truthful information with respect to Massey's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Massey's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Massey's publicly-traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Massey's safety record, business, operations, and management, and the intrinsic value of Massey's securities; and (ii) caused Plaintiff and members of the Class to purchase Massey's publicly-traded securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

A.    **Pre-Class Period Relevant Events**

33.    In 2006, a fire at a Company mine in Logan, West Virginia killed 2 miners and trapped 20 others. Testimony in an ensuing action showed that ***Blankenship suggested firing two supervisors for raising concerns about conveyor-belt problems just before the belt caught fire***. After a multi-year investigation by MSHA and the FBI, a Massey subsidiary pleaded guilty to 10 criminal charges and entered into a plea agreement with federal prosecutors to pay $4.2 million in criminal fines and civil penalties.

34.     In 2007, the U.S. Environmental Protection Agency ("EPA") sued Massey for more than 4,100 incidents of violations of the Clean Water Act ("CWA").  The EPA took the extraordinary step of suing Massey because of the company's history of non-compliance with the CWA.  In 2008, Massey paid a $20 million fine—the largest of its kind ever levied by the EPA—for violations of the CWA in connection with the Company's mining operations.

35.     On June 13, 2007, two Board members, Loeb and Swanson, jointly sent the Resignation Letter.  The Resignation Letter was prompted by "***the Company's confrontational handling of environmental and [safety] regulatory matters***."  In the letter, Loeb and Swanson explained:  "***[C]orrectible deficiencies combine to maintain a 'Blankenship Discount' in the market place for Massey's shares***, and do a grave disservice to shareholders . . . .  We cannot stand by while the Board fails to address these [safety] concerns."

36.     Massey is a defendant in a series of suits for contaminating well water with its operations.  In approximately 400 civil suits filed prior to the Class Period by approximately 700 plaintiffs seeking more than $170 million in compensatory damages from Massey and its subsidiaries, Massey is defending against allegations that its slurry and impoundment practices contaminated the well water used by hundreds of people in Mingo County, West Virginia, causing neurological and physical and other injuries (including cancers, kidney problems, gallstones, and property damage).

**B.     Class Period Events**

**(a)     Massey's Corporate Philosophy:  Profits-at-all-Costs**

37.     In the aftermath of the Explosion, Massey has insisted that the Company has never traded safety for profits.  The facts alleged herein tell a very different story.

38.     Massey is reportedly "obsessed" with production.   Blankenship routinely asks for

production updates as often as every two hours—an approach that industry experts call unusual. Further, the Company sets aggressive and frequently unachievable production targets.  A February 2010 Citigroup analyst report on Massey stated that "for the past five years, [Massey] has tended to set stretch targets that they have been unable to achieve."

39.     Indeed, production at UBB was kicked into overdrive in the past year as the Company strove to keep up with increasing demand for UBB's valuable *metallurgical* coal, which is used to make steel.[2]  In 2009, UBB workers produced 1.2 million tons of coal, a 3-fold increase from the 363,923 tons produced in 2008.  In the fourth quarter of 2009, coal production at UBB nearly doubled from the previous three months—surging from 263,319 tons mined in the third quarter to 525,207 tons in the fourth quarter.  As coal production increased at UBB, so did safety violations.  The following chart illustrates the inverse correlation.



Source: Margaret Cronin Fisk et al., "Massey Energy: The Accountant of Coal," *BusinessWeek*, Apr. 15, 2010.

---

[2]  UBB's metallurgical coal is valued at $91 per ton.  Massey's *thermal* coal, which is used by power plants that generate electricity, is valued at only $57 per ton.  The more profitable metallurgical coal at UBB constitutes approximately 25 percent of Massey's output.

40.     In the process of meeting production goals, Blankenship has publicly ridiculed safety regulators.  At a Labor Day rally in 2009, for example, Blankenship mocked federal and local elected officials who champion miner safety, calling their efforts "***as silly as global warming***."

41.     Further, Massey's corporate culture of "profits-at-all-costs" is perhaps best illustrated by the notorious October 2005 memo Blankenship sent to the Company's deep-mine superintendents:

> If any of you have been asked by your group presidents, your supervisors, engineers or anyone else to do anything other than run coal (i.e.—build overcasts,[3] do construction jobs, or whatever) you need to ignore them and run coal.  ***This memo is necessary only because we seem not to understand that coal pays the bills***.

**(b)     Massey's Corporate Strategy:
        <u>Avoid Mine Closures by Appealing Violations</u>**

42.     MSHA figures show that Massey tops the coal industry in challenging safety citations.  In 2009, Massey contested 34 percent of its assessed violations, compared with the national average of 27 percent that year.  The success of this strategy is evidenced by the following example.

43.     In September 2009, federal regulators studied UBB's safety record to see if it should be assigned "pattern of violations" status—a move that would shut down mining sections each time inspectors found serious violations.  UBB met 9 of MSHA's 10 criteria for "pattern of violations" status.  That is, UBB had at least 20 serious citations, including 2 orders citing "imminent harm" to miner safety.  However, the 10th criterion required for mine closure was a "withdrawal order" issued by MSHA inspectors for "significant and substantial" mine safety violations.

---

[3] Overcasts are ventilation controls.

44.     Even though UBB had been issued **16 withdrawal orders**, Massey challenged all of them, and those appeals were still pending at the time of the Explosion.  When weighing whether or not to put a mine in the pattern-of-violation category, federal regulators cannot count contested violations and may only consider withdrawal orders that have been issued within the past two years.  Thus, as a result of Massey's deliberate policy of delay through endless appeals, the Company was able to successfully block the closure of UBB—and the damage such a closure would inflict upon the Company's bottom line—despite the overwhelming and obvious dangers there.

45.     In the case of UBB, had the Company not contested just a single "significant and substantial" violation, MSHA could have shut UBB down.  UBB had an unusually large number of these violations, including 54 in 2009 and 2010—**a rate 11 times the national average**.  Massey, however, disputes every violation regardless of the underlying merits in order to keep generating profits-at-all-costs.

**(c)     Defendants' Materially False and Misleading
Statements and Omissions During the Class Period**

46.     Defendants falsely touted Massey's mine safety compliance achievements during the Class Period without disclosing to investors the Company's chronically poor safety record.

47.     On February 1, 2008, the first day of the Class Period, Massey reported its earnings for the fourth quarter of 2007.  Blankenship trumpeted the Company's safety record:

> We were pleased to conclude 2007 having set a company record for EBITDA, having increased our cash by $126 million, and **having set a company safety record for the lowest injury incident rate in our history.  In all we do, safety is our first priority every day**, so this record is something we are very proud of. Running safe mines is the best way to ensure shareholder value.

48.     On the same day, Massey held an earnings conference call.  Defendant Phillips, the Company's then-Executive Vice President and Chief Accounting Officer, reiterated

- 13 -

Blankenship's representations about Massey's safety record:  "*[B]y some measures, you could say we had the most successful year ever, specifically in terms of* . . . *improving the safety of our miners*."  Defendant Phillips elaborated on Massey's record with respect to non-fatal days lost ("NFDL") incident rates:

> I would be remiss if I didn't acknowledge the positive results of our safety improvement initiatives. As you know, safety is job one everyday at Massey. For 2007, **we are very pleased to have reduced our NFDL incident rate to 2.05, which was a Company record and significantly below the industry average of 3.31. We have several mines which incurred zero loss time injuries for 2007** and we're pleased to have been recognized with several safety awards during the year, including West Virginia Mountaineer Guardian Safety Awards.

49.     Massey misled investors by focusing on the summary statistic of NFDL incident rates as the measure of compliance with safety laws and regulations.  The NFDL incident rate measures days lost from injuries, not compliance with any (much less all) applicable mine safety laws and regulations.  The NFDL incident rate is a single statistical value (readily manipulable across a company the size of Massey) that by definition does not speak to fatalities, near misses, patterns of violations, "significant and substantial" violations, or any other type of mine safety complaint.  In addition, emphasis on Company-wide NFDL obscures high NFDL incident rates at particularly distressed mines—like UBB.

50.     Furthermore, according to testimony before the Senate Committee on Health, Education, Labor, and Pensions, Massey's NFDL incident rate figures were misleading because it was a Company practice to dissuade injured miners from filling out paperwork to document their injuries.  This practice is ostensibly a result of the fact that Blankenship's incentive bonus award total increases based on the percentage by which Massey NFDL incident rates are

reduced.[4]  Therefore, throughout the Class Period, the Company's reported NFDL incident rates

were far lower than they should have been and the Company's reported NFDL incident rates

were misleading.

      51.    On February 29, 2008, the Company filed its report on Form 10-K regarding its

fiscal 2007 operations and results (the "2007 10-K Report").  The 2007 10-K Report contained

the following generic and general warnings pertinent to mine health and safety requirements:

> *Mine Safety and Health*
>
> Stringent health and safety standards have been in effect since Congress enacted the Federal Coal Mine Health and Safety Act of 1969. The Federal Coal Mine Safety and Health Act of 1977 significantly expanded the enforcement of safety and health standards and imposed safety and health standards on all aspects of mining operations. A further expansion occurred in June 2006 with the enactment of the Mine Improvement and New Emergency Response Act of 2006 ("MINER Act").
>
> The MINER Act and related Mine Safety and Health Administration ("MSHA") regulatory action require, among other things, improved emergency response capability, increased availability of emergency breathable air, enhanced communication and tracking systems, more available mine rescue teams, increased mine seal strength and monitoring of sealed areas in underground mines, and larger penalties by MSHA for noncompliance by mine operators. Coal producing states, including West Virginia and Kentucky, passed similar legislation. The bituminous coal mining industry was actively engaged throughout 2009 in activities to achieve compliance with these new requirements. These compliance efforts will continue into 2008.
>
> On February 8, 2008, MSHA published a final rule that revises existing standards for mine rescue teams for underground coal mines. This final rule implements Section 4 of the MINER Act to improve overall mine rescue capability, mine emergency response time and mine rescue team effectiveness. It also calls for increased quantity and quality of mine rescue team training. Additional substantive legislation is also possible in 2008 with the passage by

---

[4] *See* DEF 14A Proxy Statement filed by the Company on April 16, 2010.

the United States House of Representatives in January 2008 of the
Supplementary Mine Improvement and New Emergency Response
Act, ("S-MINER Act"). The House legislation augments portions
of the MINER Act and proposes changes to retreat mining
practices, study of substance abuse issues and the use of coal dust
monitors to reduce miner respirable dust exposure.

All of the states in which we operate have state programs for mine
safety and health regulation and enforcement. Collectively, federal
and state safety and health regulation in the coal mining industry is
perhaps the most comprehensive and pervasive system for
protection of employee health and safety affecting any segment of
industry in the United States. While regulation has a significant
effect on our operating costs, our United States competitors are
subject to the same degree of regulation.

***Our goal is sustainable excellence in our safety and health
performance. We are committed to doing our best, and then
learning to do even better.*** We recognize each employee's
contributions to our collective safety and health efforts and reward
outstanding performance. ***We measure our success in this area
primarily through the use of occupational injury and illness
frequency rates. We believe that a superior safety and health
regime is inherently tied to achieving productivity and financial
goals, with overarching benefits for our shareholders, the
community and the environment.***

52.     The 2007 10-K Report failed to disclose any substantive information about the

ongoing and uncorrected regulatory violations throughout Massey's mining operations, including

UBB, rendering general risk disclosures and other statements in the 2007 Form 10-K Report

materially misleading and incomplete.

53.     As with Massey's 2007 10-K Report, the Company's 2008 Report on Form 10-K,

filed with the SEC on March 2, 2009, and 2009 Report on Form 10-K, filed with the SEC on

March 1, 2010, failed to disclose any substantive information about the ongoing and uncorrected

regulatory violations throughout Massey's mining operations, including UBB, rendering the risk

disclosures and other statements in the Forms 10-K materially misleading and incomplete.

54.     On April 14, 2008, Massey filed with the SEC the Company's 2007 Annual

Report, which defined the Company's "hallmark" and "*formula for success*" *as "S[afety]-1 +*

*P[roductivity]-2 + M[easurement]-3 = Shareholder Value*."  With regard to the formula, the

Report explained that "*[s]afety is job one*" and that "*[a]s our members arrive safety on the job*

*each morning, our first priority is to ensure that they go safely home each night.  Our*

*continuous safety innovations are evidence of our commitment to operating safe coal mines*."

     55.     On May 9, 2008, Massey filed with the SEC its Report on Form 10-Q for its

1Q'08, the period ending March 31, 2008 (the "1Q'08 10-Q Report"). The 1Q'08 10-Q Report

included Massey's financial results for the first quarter, and also purported to describe the

material risks to Massey's business:

> **Item 1A. Risk Factors**
>
> We are subject to a variety of risks, including, but not limited to those referenced under the heading "Certain Trends and Uncertainties" of Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations of this Quarterly Report on Form 10-Q and those referenced herein to other Items contained in our Annual Report on Form 10-K for the year ended December 31, 2007, including Item 1. Business, under the headings "Customers and Coal Contracts," "Competition," and "Environmental, Safety and Health Laws and  Regulations," Item 1A. Risk Factors, Item 3. Legal Proceedings and Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Critical Accounting Estimates and Assumptions," "Certain Trends and Uncertainties" and elsewhere in Management's Discussion and Analysis of Financial Condition and Results of Operations. Except as set forth under "Certain Trends and Uncertainties" and elsewhere under Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations of this Quarterly Report on Form 10-Q, we do not believe there have been any material changes to the risk factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2007.

56.     The Q1'08 10-Q Report failed to disclose any substantive information about the ongoing and uncorrected regulatory violations throughout Massey's mining operations, including UBB, rendering the risk disclosures and other statements in the Form 10-Q materially misleading and incomplete.

57.     Rather than making any substantive disclosures of the material risks to the Company's operations arising from the uncorrected regulatory violations then existing at its mines, the Q1'08 10-Q Report referred to and incorporated only generic boilerplate disclosures about mine health and safety requirements in the Company's 2007 10-K Report.

58.     Similarly, the Q2'08 Report on Form 10-Q filed on August 4, 2008, Q3'08 Report on Form 10-Q filed on November 7, 2008, Q1'09 Report on Form 10-Q filed on May 8, 2009, Q2'09 Report on Form 10-Q filed on August 10, 2009, and the Q3'09 Report on Form 10-Q filed on October 28, 2009, all failed to disclose any substantive information about the ongoing and uncorrected regulatory violations throughout Massey's mining operations, including UBB, rendering the risk disclosures and other statements in the Forms 10-Q materially misleading and incomplete.

59.     Rather than making substantive disclosures of the material risks to the Company's operations arising from the uncorrected regulatory violations then existing at the Company's mines, the Form 10-Q Reports listed in Paragraph 58 referred to and incorporated the generic and general warnings pertinent to mine health and safety requirements in the Company's most recent Form 10-K Report, respectively.

60.     On October 27, 2009, the Company issued a press release announcing its Q3'09 financial results. The release included the following statements:

*Safety*

**Massey remains on track for another record year in terms of**

*safety.* Through the first nine months of 2009, Massey reported a non-fatal days lost (NFDL) incident of 1.72. The Company's previous best rate for a full year was 1.93, achieved in 2008. By comparison, the bituminous coal industry average NFDL rate was 2.95 in 2008.

61.    On October 28, 2009, the Company reported its Q3'09 earnings, again touting its

ability to achieve positive financial results while maintaining a mine safety program that was

second to none in the industry.  That same day, the Company issued a press release heralding its

receipt of a prestigious MSHA safety award.  The release stated, in part:

**Massey Energy Becomes First Mining Company to Win Three Sentinels of Safety Awards in a Single Year**

**Massey Accepts Awards from the National Mining Association and the U.S. Mine Safety and Health Administration in Washington**

[M]assey Energy today accepted three Sentinels of Safety Awards in Washington, DC.  The annual Sentinels of Safety award program recognizes achievement of outstanding safety records in America's mineral extractive industries.  The Sentinels of Safety awards program is co-sponsored by the National Mining Association (NMA) and the Mine Safety and Health Administration.  Massey is the first mining company ever to receive three of the mining industry's most prestigious safety awards in one year.

The three Massey facilities to receive the Sentinels of Safety awards include:

– Chess Processing, of Elk Run Coal Company, in the Large Coal Processing Facility Group

– Chesterfield Preparation Plant, of Omar Mining Company, in the Small Coal Processing Facility Group

– North Surface Mine, of Alex Energy, Inc., in the Small Surface Coal Group

***"At Massey Energy, we embrace our commitment to safety at all levels – from executive to miner. The Sentinels of Safety awards reflect the Company's dedication to safety at all of our facilities," said Massey Chairman and CEO Don L. Blankenship. "No coal***

*company can succeed over the long term without a total commitment to safety. More importantly, Massey is a family. We care about protecting our fellow members, which is why we strive to remain an industry leader in safety," added Mr. Blankenship*.

2008 marked the safest year in Massey history, and fifth straight year in which Massey's safety performance was stronger than the industry average. *In fact, Massey's safety performance has been stronger than the industry average for 16 of the past 18 years*.

62.     On October 28, 2009, the Company conducted a regularly scheduled conference call with analysts and investors to discuss its Q3'09 financial results. Seeking to bring further attention to its purportedly strong safety record, Massey timed its earnings release to coincide with the Sentinels of Safety award presentation. At the outset of the conference call, Defendant Phillips made the following statement:

This morning we are conducting our call from Washington DC, the location of the Sentinels of Safety Awards Ceremony. Massey will be recognized as the recipient of three prestigious National Safety Awards later today. The awards in today's ceremony are sponsored by the National Mining Association and the U.S. Mine Safety and Health Administration. Massey is the winner of three of six awards in coal-related categories. *We understand that this is the first time a company has won three Sentinels of Safety Awards in the same year. We are very proud of this accomplishment and our members who work so hard to make Massey's mines among the safest in the industry*.

63.     On February 2, 2010, the Company reported its financial results for fiscal year 2009, the period ending December 31, 2009. The release included the following statements:

**<u>Safety</u>**

Massey completed the safest year in Company history by achieving a nonfatal days lost (NFDL) incident rate of 1.67 in the full year 2009. The Company's previous best rate for a full year was 1.93, achieved in 2008. By comparison, the bituminous coal industry average NFDL rate was 2.95 in 2008. "*We are extremely proud of our safety accomplishments in our operations,*" said Massey's President Baxter F. Phillips, Jr. *"Safety has long been our top priority. Many of our operations worked the entire year without a single lost time incident*. We continue to make

significant investments of time, personnel and capital to ensure that our mines are as safe as they can be and achieving this record low rate is a reflection of that commitment."

**2009 was the sixth consecutive year and the seventeenth year in the past nineteen years in which Massey's NFDL incident rate was better than the bituminous coal industry average**.

64.     On February 3, 2010, the Company conducted a regularly scheduled conference call with analysts and investors to discuss its 2009 financial results.  At the outset of the call, Massey President Phillips again touted the purported safety of the Company's operations:

> Turning your attention to safety, **we are extremely proud of our accomplishments in improving the safety of our members in our operations during 2009**. We completed the safest year in Company history by achieving a nonfatal days lost, NFDL incident rate of 1.67 for the full year 2009. Our Company's previous best rate for a full year was 1.93 achieved in 2008. Many of our operations worked the entire year without a single lost time accident. **We continue to make significant investments of time, personnel and capital to ensure that our mines are as safe as they can be and achieving this record low rate is a reflection of that commitment**. I know many of our operation managers and safety development group members will be listening to this call and I congratulate them on our safety record in 2009 and challenge them to continue this trend in 2010.

65.     On March 22, 2010, Massey filed a Prospectus Supplement on Form 424B5 that, as amended on March 24, 2010, provided for the registration and offering of up to 9.75 million shares of Massey stock pursuant to a Registration Statement on Form S-3 filed on August 5, 2008, and was signed by Defendants Phillips, Blankenship, Tolbert, Crawford, Foglesong, Gabrys, Judge, Moore, and Suboleski, Massey Controller David W. Owings, and Massey directors Gee and Inman (the "Offering").  The Prospectus Supplement stated that the estimated net proceeds of $405 million from the Offering were intended to be used to fund part of the purchase price for the Company's acquisition of Cumberland Resources Corporation and certain affiliated companies, announced on March 16, 2010 and completed on April 19, 2010.

66.     The Prospectus Supplement stated the following with respect to the safety of

Massey's operations:

> **Strategy**
>
> Our primary objectives are to capitalize on current market conditions and to continue to build upon our competitive strengths to enhance our position as one of the premier coal producers in the U.S. by:
>
> *Maintaining focus on high safety standards*. We believe a safe mine is a profitable mine. We strive to maintain safe operations and ***continue to develop and implement new safety improvement initiatives that exceed regulatory requirements***. For the year ended December 31, 2009, we recorded an all-time Company best Nonfatal Days Lost ("NFDL") rate of 1.67. The bituminous coal mining industry average NFDL rate was 2.95 in 2008. We continually review and update our safety procedures and equipment, and we believe our focus on high safety standards has resulted in fewer injuries and accidents and cost savings related thereto.

67.     The Prospectus Supplement and Registration Statement incorporated by reference

the incomplete risk disclosures included in the Company's Forms 10-K, discussed in Paragraph

53. The Prospectus Supplement also included the following disclosure of potential risks

associated with Massey's mining operations:

> **Federal, state and local laws and government regulations applicable to operations increase costs and may make our coal less competitive than other coal producers.**
>
> We incur substantial costs and liabilities under increasingly strict federal, state and local environmental, health and safety and endangered species laws, regulations and enforcement policies. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from our operations. The costs of compliance with applicable regulations and liabilities assessed for compliance failure could have a material adverse

- 22 -

impact on our cash flows, results of operations or financial condition.

68.     On April 30, 2010, the Company filed with the SEC a Shareholder Presentation that stated "***S[afety]-1 is not just a slogan, but a vow.***"

69.     The foregoing statements were materially false and misleading because they misrepresented existing facts that were known to Defendants, recklessly disregarded by them, or omitted to disclose facts that Defendants were under a duty to disclose, or that Defendants knew or disregarded were necessary to disclose in order to make the statements not misleading to investors.  The facts and conditions not revealed by Defendants included the following:

(a)     that Massey was not conducting its operations in compliance with statutes and regulations governing mine worker safety and, in fact, had numerous uncorrected safety violations throughout its mining properties, including at UBB;

(b)     that Defendants were deliberately permitting miners to work in unsafe conditions, jeopardizing the health and safety of the Company's employees, as well as the Company's financial condition and overall operations;

(c)     Massey's mines were not "among the safest in the industry," the Company was not "continually a leader among bituminous coal producers when it comes to safety," nor was the Company's "first priority . . . to ensure that [its miners] go safely home each night";

(d)     the warnings that Massey "may" incur financial penalties or other liabilities in connection with safety violations at its mines were misleading because the warned-of risks had already manifested, and thus were not uncertain or potential future events, as represented by the warnings;

(e)     the Explosion resulted from Massey's operation of the mine in an unsafe condition in violation of statutory and regulatory requirements and was not the result of an

"inherent risk" of coal mining, such that the Company's "inherent risk" warning and other risk disclosures were insufficient to warn investors of the actual risks of tragedies like the explosion at UBB;

(f)    the ongoing violations at Massey's operations were not the result of actions "by individuals or companies no longer affiliated with" the Company;

(g)    Massey did not "continue to make significant investments of time, personnel and capital to ensure that [its] mines are as safe as they can be," nor did its reported financial results or projections for future earnings reflect the true actual costs of safety compliance that Defendants knew were required to comply with applicable laws and regulations or make its mines "as safe as they can be"; and

(h)    (viii) Massey's reliance on Company-wide NFDL incident rates to monitor the Company's compliance with all applicable mine safety law and regulations obfuscated the fact that specific mines had very high NFDL incident rates.[5]

**(d)    The Truth Emerges**

70.    The Explosion killed 29 miners and has resulted in the MSHA's seizure of UBB and precipitated simultaneous investigations by federal, state, and Company officials.  The Explosion has shed a floodlight on Massey's severe and systemic non-compliance with mine safety laws at UBB, as well as its other mines.  Upon the market's revelation of the Explosion, Massey's stock plunged $9.47, or more than 17 percent, to $45.22 over the subsequent two days.

---

[5] For example, Defendants announced that, for 2009, "Massey had recorded an all-time best NFDL incident rate (a measure of lost-time accidents) of 1.67" and noted that this rate was almost half the bituminous coal mining industry average of 2.95 for 2008.  However, 2009 represented the second straight year that UBB recorded an NFDL incident rate *nearly twice the industry average* and *over three times the rate reported by Defendants as the Company's overall NFDL.*  For 2008, a year that the Company touted as being the "safest" in its history, UBB's NFDL incident rate was 6.07, or 3.14 times the Company's overall NFDL.  In 2009, UBB's NFDL incident rate was 5.81, or 3.47 times the rate for the Company as a whole.

More specifically, on April 6, 2010, the first trading day following the Explosion, Massey common stock fell $6.24, a one-day drop of 11.41 percent.  The next day, on April 7, 2010, amid further revelations of the unsafe conditions in Massey's operations as rescue efforts for trapped and injured miners continued, Massey's stock declined another $3.23.

71.     In the aftermath of the Explosion, scrutiny of Massey further revealed the extent and seriousness of the safety and regulatory violations plaguing the Company's operations.   J. Davitt McAteer ("McAteer"), a former assistant director of MSHA, said Massey "*is certainly one of the worst in the industry*" when it comes to safety and called recent violations regarding substandard ventilation and other problems "*cardinal sins*."[6]  McAteer elaborated:  "*The Massey record is without doubt one of the most difficult in the industry from a safety standpoint*."  He stated that other large, diversified coal operators have far better safety records.

72.     On April 19, 2010, two weeks after the Explosion, Defendant Judge resigned from Massey's Board.  On April 23, 2010, *The Wall Street Journal* noted that Judge's resignation came after months of ongoing, vociferous criticism that Judge had been neglecting her management and oversight duties at Massey.  Critics charged that Judge "was unable to devote enough time to [her Massey directorship] because she served on too many corporate boards."

73.     On April 23, 2010, it was revealed that federal mine safety inspectors who visited UBB in January 2010 reported that senior managers showed "*reckless disregard*" *for worker safety by telling a foreman to ignore a citation the mine had received for faulty ventilation three weeks earlier*.  According to UBB inspectors, the President and Vice President of Performance Coal told the foreman "not to worry about it" when they spoke to the foreman about

---

[6] *See* Ian Urbina & Michael Cooper, "Deaths at West Virginia Mine Raise Issues About Safety," *N.Y. Times*, Apr. 6, 2010.

the ventilation problem cited by federal mine safety inspectors.

74.     One of the MSHA inspectors went on to say that "the operator has shown a *reckless disregard of care to the miners* on this section and [eligible] [sic] men that use this escapeway."  He added later that "I believe the operator has shown *high negligence* due to fact of management knowing where problem is."  He said the ventilation flaw could "*result in fatal injuries*" by sending methane to the coal face where drilling was taking place.

75.     On April 30, 2010, it was disclosed that the FBI is investigating Massey for bribery of state and federal mine inspectors.  At least two dozen Massey employees, federal and state officials, and mine union members have been interviewed by FBI agents.  As a direct result of this news, Massey's stock fell $4.53 per share, or 11 percent, to $36.63 in response to this disclosure.

76.     On May 14, 2010, federal prosecutors from the U.S. Attorney's Office for the Southern District of West Virginia confirmed that Justice Department officials are investigating whether "directors, officers, and agents" of Performance Coal "engaged in willful criminal activity at [UBB]" in connection with alleged violations of federal mine safety regulations at UBB between 2007 and 2010.  As a direct result of this news, Massey stock fell $3.71 per share, or 10 percent, to $33.29 on May 17, 2010.

**<u>SCIENTER</u>**

77.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Defendants participated in a scheme to defraud and committed acts, and practiced and participated in a course of business that operated as a fraud or

deceit on purchasers of Massey stock during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

78.     During the Class Period, as detailed herein, Defendants made false and

misleading statements and engaged in a scheme to deceive the market and a course of conduct

that artificially inflated the price of Massey securities and operated as fraud or deceit on Class

Period purchasers of Massey securities by misrepresenting the Company's compliance with

safety laws and regulations.  Later, when Defendants' prior misrepresentations and fraudulent

conduct became apparent to the market, the price of Massey securities fell precipitously as the

prior artificial inflation came out of the price.  As a result of their purchases of Massey securities

during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e.,

damages, under the federal securities laws.

## NO SAFE HARBOR

79.     Massey's verbal "Safe Harbor" warnings accompanying its oral forward-looking

statements ("FLS") issued during the Class Period were ineffective to shield those statements

from liability.

80.     Defendants are also liable for any false FLS pleaded because, at the time each

FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved

by an executive officer of Massey who knew that the FLS was false.  None of the historic or

present-tense statements made by Defendants were assumptions underlying or relating to any

plan, projection, or statement of future economic performance, as they were not stated to be such

assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by Defendants

expressly related to, or stated to be dependent on, those historic or present tense statements when

made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET

81.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Massey stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

82.     At all relevant times, the markets for Massey stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, Massey filed periodic public reports with the SEC;

(b)     Massey regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Massey common stock was actively traded in an efficient market, namely the NYSE, under the symbol "MEE."

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants, directors, and officers of Massey, and their families and affiliates.

84.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Massey had more than 86 million shares of stock outstanding, owned by thousands of persons.

85.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Massey stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

86.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

87.     Plaintiff will adequately protect the interests of the Class and has retained counsel

who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT  I

### For Violation of § 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

89.     Plaintiff incorporates Paragraphs 1-88 by reference.

90.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Massey stock during the Class Period.

92.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Massey stock.  Plaintiff and the Class would not have purchased Massey stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by Defendants' misleading statements.

93.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Massey stock during the Class Period.

## COUNT  II

### For Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

94.     Plaintiff incorporates Paragraphs 1-93 by reference.

95.     The Individual Defendants acted as controlling persons of Massey within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Massey, the Individual Defendants had the power and ability to control the actions of Massey and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 28, 2010                                    /s/ Samuel D. Elswick

Samuel D. Elswick
James A. McKowen
JAMES F. HUMPHREYS & ASSOCIATES L.C.
United Center, Suite 800
500 Virginia Street, East
Charleston, West Virginia 25301
Telephone:  (304) 347-5050
Facsimile: (304) 347-5055
jhumphreys@jfhumphreys.com

*Liaison Counsel*


Christopher J. Keller
Eric J. Belfi
Alan I. Ellman
Stefanie J. Sundel
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
aellman@labaton.com
ssundel@labaton.com

J. Burton LeBlanc
Mazin Sbaiti
BARON & BUDD, P.C.
312 Oak Lawn Avenue, Suite 1100
Dallas, Texas  75219
Telephone: (214) 521-3605
Facsimile: (214) 520-1181
bleblanc@baronbudd.com
msbaiti@baronbudd.com

*Attorneys for Plaintiffs*